No. 24-2123 (Lead)
*Also Filed In Nos. 24-2215, 24-2225, & 24-2494*

UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT
_____

SOUTHWESTERN ELECTRIC POWER COMPANY, et al.,

Petitioners,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, and
MICHAEL S. REGAN, Administrator, United States Environmental Protection
Agency,

Respondents,

CLEAN WATER ACTION, SIERRA CLUB, WATERKEEPER ALLIANCE, INC.,
NATURAL RESOURCES DEFENSE COUNCIL, INC., ENVIRONMENTAL
INTEGRITY PROJECT, PENNENVIRONMENT, INC. and PRAIRIE RIVERS
NETWORK,

Respondent-Intervenors.
_____

**RESPONDENT-INTERVENORS' RESPONSE TO UTILITY AND STATE
PETITIONERS' MOTION FOR A STAY PENDING REVIEW**
_____

# TABLE OF CONTENTS

INTRODUCTION ................................................................................1

BACKGROUND ................................................................................2

ARGUMENT ....................................................................................6

I.     MOVANTS ARE NOT LIKELY TO SUCCEED ON THE MERITS................6

    A. EPA's BAT Determination Comports with the Well-Established Meaning of "Available." ......................................................................6

    B. EPA Lawfully Determined That Zero-Discharge Technology Is Economically Achievable. ...................................................8

       1. Membrane filtration is economically achievable because the costs can be reasonably borne by the industry. .....................................8

       2. EPA did not "sidestep" any demonstrated errors in its cost-estimation methodology......................................................9

       3. EPA adequately considered reliance costs and provided a reasoned explanation for its BAT determination in the 2024 Rule.......................11

II.    MOVANTS FAIL TO SHOW IRREPARABLE HARM. ................................13

    A. Movants Do Not Prove They Will in Fact Incur Great Costs Imminently. ......................................................................13

    B. Movants Speculate About Reliability Harms.............................16

    C. Any Near-Term Planning Costs Would Be Minimal. .................18

III.   THE PUBLIC INTEREST AND BALANCE OF EQUITIES WEIGH HEAVILY AGAINST A STAY. ........................................................19

CONCLUSION ................................................................................22

CERTIFICATE OF COMPLIANCE......................................................25

CERTIFICATE OF SERVICE .............................................................26

Appellate Case: 24-2123   Page: 2   Date Filed: 08/20/2024 Entry ID: 5426423

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Iron & Steel Inst. v. EPA*,
526 F.2d 1027 (3d Cir. 1975) .......................................................................4, 10

*Am. Paper Inst. v. Train*,
543 F.2d 328 (D.C. Cir. 1976) .................................................................5

*Am. Petroleum Inst. v. EPA*,
858 F.2d 261 (5th Cir. 1988) .................................................................3, 7

*Ass'n of Pac. Fisheries v. EPA*,
615 F.2d 794 (9th Cir. 1980) .................................................................5

*BP Expl. & Oil, Inc. v. EPA*,
66 F.3d 784 (6th Cir. 1995) .................................................................5

*Chem. Mfrs. Ass'n v. EPA*,
870 F.2d 177 (5th Cir. 1989) .................................................................3, 7

*CPC Int'l, Inc. v. Train*,
540 F.2d 1329 (8th Cir. 1976) .................................................................4

*E.I. du Pont de Nemours & Co. v. Train*,
430 U.S. 112 (1977) .................................................................4, 10

*EPA v. Nat'l Crushed Stone Ass'n*,
449 U.S. 64 (1980) .................................................................2, 4

*F.C.C. v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) .................................................................11, 12

*FMC Corp. v. Train*,
539 F.2d 973 (4th Cir. 1976) .................................................................3, 7

*Kennecott v. EPA*,
780 F.2d 445 (4th Cir. 1985) .................................................................3, 4, 7

Appellate Case: 24-2123    Page: 3    Date Filed: 08/20/2024 Entry ID: 5426423

*Morehouse Enters., LLC v. Bureau of Alcohol, Tobacco, Firearms & Explosives*,
78 F.4th 1011 (8th Cir. 2023) ...............................................................13

*Nat. Res. Def. Council v. EPA*,
808 F.3d 556 (2d Cir. 2015) ....................................................................3

*Nat. Res. Def. Council v. EPA*,
822 F.2d 104 (D.C. Cir. 1987) ................................................................3

*Nat. Res. Def. Council v. EPA*,
863 F.2d 1420 (9th Cir. 1988) ................................................................3

*Nken v. Holder*,
556 U.S. 418 (2009)............................................................1, 13, 19

*Ohio v. EPA*,
144 S. Ct. 2040 (2024)...........................................................................12

*Packard Elevator v. I.C.C.*,
782 F.2d 112 (8th Cir. 1986) ..............................................13, 15, 18, 19

*Reynolds Metals Co. v. EPA*,
760 F.2d 549 (4th Cir. 1985) .............................................................3, 4

*Riverkeeper, Inc. v. EPA*,
475 F.3d 83 (2d Cir. 2007), *rev'd on other grounds sub nom.*
*Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208 (2009) ................................3, 4

*Rybachek v. EPA*,
904 F.2d 1276 (9th Cir. 1990) ............................................................4, 9

*Sw. Elec. Power Co. v. EPA*,
920 F.3d 999 (5th Cir. 2019) ..................................................................5

*Tex. Oil & Gas Ass'n v. EPA*,
161 F.3d 923 (5th Cir. 1998) ..................................................................5

*Voyageurs Nat. Park Ass'n v. Norton*,
381 F.3d 759 (8th Cir. 2004) ................................................................11

*Waterkeeper All., Inc. v. EPA*,
399 F.3d 486 (2d Cir. 2005) ..........................................................4, 5, 9

iii

*West Virginia v. EPA*,
   No. 24-1120, 2024 WL 3542546 (D.C. Cir. July 19, 2024)...............................14

*Winter v. Nat. Res. Def. Council*,
   555 U.S. 7 (2008)..............................................................................................18

**Statutes**

33 U.S.C. § 1251(a)(1).................................................................................................2

33 U.S.C. § 1311(b)......................................................................................................2

33 U.S.C. § 1311(d)......................................................................................................2

33 U.S.C. § 1314(b)......................................................................................................4

**Regulations**

40 C.F.R. § 423.13(g)(4)..........................................................................................6, 12

40 C.F.R. § 423.13(k)(4)...............................................................................................6

40 C.F.R. § 423.13(l) ....................................................................................................6

**Federal Register**

88 Fed. Reg. 18,824 (Mar. 29, 2023)....................................................................7, 8, 9

89 Fed. Reg. 40,198 (May 9, 2024) ..................................................................*passim*

## INTRODUCTION

Utility and State Petitioners' Motion for a Stay Pending Review ("Motion") to the Environmental Protection Agency's ("EPA") final rule strengthening effluent limitation guidelines ("ELGs") for steam electric power plants (the "2024 Rule"),[1] fails to satisfy the stringent standards for a stay. *See Nken v. Holder*, 556 U.S. 418, 433–34 (2009). Movants' challenges to the 2024 Rule are unlikely to succeed because EPA's rulemaking record demonstrates that zero-discharge technologies are available and economically achievable, consistent with Clean Water Act ("CWA") requirements. During the rulemaking process, EPA both adequately considered Movants' concerns that EPA had underestimated compliance costs and reasonably explained its cost methodology and conclusion that the costs of the 2024 Rule can be reasonably borne by the industry.

Movants have also not met their burden to show they will suffer irreparable harm before the Court decides their legal challenges. Movants' arguments ignore the 2024 Rule's lengthy compliance timeline while citing inflated and misleading cost estimates and unsupported reliability claims. Finally, the public interest and balance of equities weigh heavily against staying a rule that will prevent more than 660 million pounds of pollutants from entering U.S. waters each year and provide

---

[1] 89 Fed. Reg. 40,198 (May 9, 2024).

Appellate Case: 24-2123    Page: 6    Date Filed: 08/20/2024 Entry ID: 5426423

hundreds of millions of dollars per year in public health and environmental benefits.

Petitioners in consolidated case No. 24-2255, Catawba Riverkeeper and Winyah Rivers Alliance, join this response in full.

The stay motion should be denied.

## BACKGROUND

The CWA sets a goal of eliminating water pollution. 33 U.S.C. § 1251(a)(1). To help achieve that goal, EPA must establish, and review every five years and revise as appropriate, ELGs setting increasingly stringent limits for categories of industries based on the capabilities of wastewater treatment technologies. 33 U.S.C. § 1311(b), (d). For toxic pollutants such as heavy metals, the CWA required EPA to set initial standards based on best practicable control technology ("BPT"), *id.* § 1311(b)(1)(A), followed by increasingly more stringent standards based on best available technology economically achievable ("BAT"), *id.* § 1311(b)(2)(A).

BAT represents a stringent treatment standard that is "a commitment of the maximum resources economically possible to the ultimate goal of eliminating all polluting discharges," *EPA v. Nat'l Crushed Stone Ass'n*, 449 U.S. 64, 74 (1980), including "requir[ing] the elimination of discharges of all pollutants" if "such elimination is technologically and economically achievable," 33 U.S.C. § 1311(b)(2)(A).

2

Congress intended BAT standards to be "technology-forcing,"[2] with EPA looking to the best-performing facilities to determine which technologies are available to the industry as a whole.[3] A technology is "available" if it is in use in the industry, even if only by the best-performing plant, or if it can be demonstrated through pilot studies or use in other industries,[4] so long as EPA shows that the technology is transferable to the industry for which it is establishing BAT.[5]

---

[2] *See Nat. Res. Def. Council v. EPA*, 808 F.3d 556, 563–64 (2d Cir. 2015) ("Congress designed [BAT] to be technology-forcing, meaning it should force agencies and permit applicants to adopt technologies that achieve the greatest reductions in pollution."); *Nat. Res. Def. Council v. EPA*, 822 F.2d 104, 123 (D.C. Cir. 1987) ("the most salient characteristic of this [CWA] statutory scheme, articulated time and again by its architects and embedded in the statutory language, is that it is technology-forcing").

[3] *Chem. Mfrs. Ass'n v. EPA*, 870 F.2d 177, 226 (5th Cir. 1989); *see also Nat. Res. Def. Council v. EPA*, 863 F.2d 1420, 1426 (9th Cir. 1988); *Kennecott v. EPA*, 780 F.2d 445, 448 (4th Cir. 1985) ("In setting BAT, EPA uses not the average plant, but the optimally operating plant, the pilot plant which acts as a beacon to show what is possible."); *cf. Riverkeeper, Inc. v. EPA*, 475 F.3d 83, 107–08 (2d Cir. 2007) ("The statutory directive requiring facilities to adopt the best technology cannot be construed to permit a facility to take measures that produce second-best results . . . especially given the technology-forcing imperative behind the Act . . . .") (citations omitted), *rev'd on other grounds sub nom. Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208 (2009).

[4] *See Chem. Mfrs. Ass'n*, 870 F.2d at 226; *Am. Petroleum Inst. v. EPA*, 858 F.2d 261, 265 (5th Cir. 1988) (BAT need not be "in use" to be "deemed 'available'"); *Kennecott*, 780 F.2d at 448; *FMC Corp. v. Train*, 539 F.2d 973, 983–84 (4th Cir. 1976) (EPA justified in setting BAT based on performance data from a single pilot plant).

[5] *Kennecott*, 780 F.2d at 453 ("Progress would be slowed if EPA were invariably limited to treatment schemes already in force at the plants which are the subject of the rulemaking."); *see also Reynolds Metals Co. v. EPA*, 760 F.2d 549, 562 (4th Cir. 1985).

3

Congress intended BAT to "push[] industries toward the goal of zero discharge as quickly as possible."[6]

A technology is economically achievable if the "costs can be reasonably borne by the industry."[7] EPA determines BAT for industrial categories, rather than plant by plant,[8] and therefore considers costs to the industry as a whole.[9] In determining BAT, costs are to be given less importance than for the less stringent BPT standards. Congress underscored this by requiring EPA to balance costs against benefits for BPT but omitting any cost-benefit analysis from BAT requirements.[10] Accordingly, courts have consistently held that EPA is precluded from basing a BAT determination on cost-benefit analysis.[11]

---

[6] *Kennecott*, 780 F.2d at 448.

[7] *Waterkeeper All., Inc. v. EPA*, 399 F.3d 486, 516 (2d Cir. 2005); *Rybachek v. EPA*, 904 F.2d 1276, 1290–91 (9th Cir. 1990) (discussing this standard).

[8] *E.I. du Pont de Nemours & Co. v. Train*, 430 U.S. 112, 127 (1977).

[9] *See Am. Iron & Steel Inst. v. EPA*, 526 F.2d 1027, 1051 (3d Cir. 1975) (cost must be considered "on a class or category basis, rather than [on] a plant-by-plant basis").

[10] *Compare* 33 U.S.C. § 1314(b)(1)(B) *with id.* § 1314(b)(2)(B).

[11] *See, e.g.*, *Entergy Corp.*, 556 U.S. at 222 (affirming that only certain CWA standards "authorize cost-benefit analysis" and that BAT is not one of them); *Nat'l Crushed Stone*, 449 U.S. at 71 ("[I]n assessing BAT total cost is no longer to be considered in comparison to effluent reduction benefits."); *Am. Iron & Steel Inst.*, 526 F.2d at 1052 n.54 ("cost-benefit analysis is not required at all" for BAT); *CPC Int'l, Inc. v. Train*, 540 F.2d 1329, 1341–42 (8th Cir. 1976) (BAT guidelines are "governed by a standard of reasonableness without the necessity of a thorough cost-benefit analysis"); *Reynolds Metals Co.*, 760 F.2d at 565 ("no balancing is required" for BAT); *Rybachek*, 904 F.2d at 1290–91 (EPA "need not compare [control] cost with the benefits of effluent reduction"); *BP Expl. & Oil, Inc. v.*

4

The 2024 Rule is EPA's third in a series of rulemakings since 2015 updating the steam electric ELGs. 89 Fed. Reg. at 40,199, 40,203–04. In April 2019, the U.S. Court of Appeals for the Fifth Circuit vacated certain provisions of the 2015 Rule because EPA had purported to determine that "demonstrably outdated and ineffective" surface impoundments were BAT for those waste streams. *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1031 (5th Cir. 2019). This decision reaffirmed the well-established law that ELGs are required to be technology-forcing, and that BAT must be based on the best-performing plant in the industry and the most effective technologies that are available and achievable. *See generally id.* at 1004–07, 1015–33.

The 2024 Rule requires power plants that intend to operate past 2034 to utilize commercially available, affordable treatment technologies to eliminate discharges of toxic pollutants from their three largest toxic waste streams: flue gas

---

*EPA,* 66 F.3d 784, 799–800 (6th Cir. 1995) (rejecting industry demand for cost-benefit analysis because BAT "does not require cost-benefit analysis" and "EPA need only find . . . that the cost of the technology is reasonable"); *Tex. Oil & Gas Ass'n v. EPA*, 161 F.3d 923, 928 (5th Cir. 1998) (underlining that "BAT is the CWA's most stringent standard" and must be set based not on cost-benefit analysis but on "performance of the single best-performing plant in an industrial field"); *Waterkeeper All., Inc.*, 399 F.3d at 516 (BAT can be set to level that can "reasonably be borne by a given industry"); *Am. Paper Inst. v. Train*, 543 F.2d 328, 354 (D.C. Cir. 1976) ("Section 304(b)(2)(B) mandates no [cost-benefit] balancing"); *Ass'n of Pac. Fisheries v. EPA*, 615 F.2d 794, 805 (9th Cir. 1980) ("The conspicuous absence of the comparative language contained in section 304(b)(1)(B) leads us to the conclusion that Congress did not intend the Agency or this court to engage in marginal cost-benefit comparisons [for BAT].").

Appellate Case: 24-2123     Page: 10     Date Filed: 08/20/2024 Entry ID: 5426423

desulfurization ("scrubber") wastewater, bottom ash transport water, and combustion residual leachate ("leachate"). 40 C.F.R. § 423.13(g)(4), (k)(4), (*l*)(1). The Rule also creates a new subcategory for power plants that commit to retire by 2034 that allows them to avoid the new, more stringent requirements, *id.* § 423.13(g)(4)(iii), (k)(4)(iii), (*l*)(2)(i). Movants request that this Court stay these and other 2024 Rule requirements in their entirety.[12]

## ARGUMENT

## I.   MOVANTS ARE NOT LIKELY TO SUCCEED ON THE MERITS.

### A. EPA's BAT Determination Comports with the Well-Established Meaning of "Available."

EPA lawfully determined that BAT for scrubber wastewater and leachate can achieve zero discharge pollutant limits and that membrane filtration and other technology options to meet those limits are available. Movants allege that zero-discharge technology is "not available to actually (and if so reliably) achieve zero discharge limits." Motion at 19. However, Movants erroneously rely upon a general-usage definition of "available" in Merriam-Webster rather than the

---

[12] Despite this request, Movants' arguments exclusively concern the 2024 Rule's scrubber and "managed" leachate limits, which they claim require membrane and evaporator technologies. *See, e.g.*, Motion at 19 & Motion Ex. 1 (¶¶ 19–26, 37), Ex. 6 (at 5, 91, 157), Ex. 19 (¶ 25), Ex. 20 (¶ 13), Ex. 21 (¶ 12), Ex. 22 (¶ 7). Because limits on other waste streams and other changes to the regulations do not relate to those technologies, Movants offer no basis for staying those limits.

6

definition determined by the courts applying this statute. Courts have consistently held that BAT technology is "available" if it is in use in the industry, even if only by the best-performing plant, or if it can be demonstrated through pilot studies or use in other industries. *See Chem. Mfrs. Ass'n*, 870 F.2d at 226; *Am. Petroleum Inst.*, 858 F.2d at 265; *Kennecott*, 780 F.2d at 448; *FMC Corp.*, 539 F.2d at 983–84.

Here, EPA did much more than determine that zero-discharge technology is "merely 'possible,'" or "wish[] [it] into existence," as Movants argue. Motion at 20. Rather, the record shows membrane filtration is available because it is being used in "different subcategor[ies] or categor[ies], bench scale or pilot plant studies, [and] foreign plants." 89 Fed. Reg. at 40,202 (citing *Sw. Elec. Power Co.*, 920 F.3d at 1006). EPA completed a "Preliminary Technology Review" of membrane treatment and listed twenty-three industrial categories, including the steam electric industry, that use the technology.[13] EPA also identified at least three domestic plants using membrane filtration[14] and twenty-two domestic pilot applications,[15] as

---

[13] Ex. 1 at 5, Tbl.2.

[14] *See* Ex. 2 at Tbl.2. This table suggests that there are at least three plants (Cross Generating Station, Monroe Power Plant, and Plant Scherer) that have already purchased and installed membrane filtration systems, two of which are able to meet a zero-discharge standard without any additional investment.

[15] 88 Fed. Reg. 18,824, 18,840 (Mar. 29, 2023).

well as "American-made" zero-discharge systems that have routinely been used in other countries since 2015.[16]

Additionally, there are multiple options other than membrane filtration, which can be used alone or in combination, to meet the zero-discharge limit. *See id.* at 40,208–09. Forty domestic coal plants with wet scrubber systems have already achieved zero-discharge using other technologies, including evaporation systems. *Id.* at 40,216. In fact, more domestic facilities operate, or have operated, zero-discharge systems than the biological treatment systems on which EPA based BAT limits in 2015 and 2020. *Id.*

## B. EPA Lawfully Determined That Zero-Discharge Technology Is Economically Achievable.

### 1. *Membrane filtration is economically achievable because the costs can be reasonably borne by the industry.*

The record shows that, after updating the analysis and modeling for the final rule, EPA lawfully determined that membrane filtration is economically achievable for the industry. 89 Fed. Reg at 40,219, 40,257–59. EPA also confirmed with new information that membrane filtration is often cheaper than the technology required by the 2020 Rule. *Id.* at 40,213, n.64. Moreover, EPA determined that other zero-discharge technologies are economically achievable and, in some cases, the

_____

[16] 89 Fed. Reg. at 40,216; *see also* Ex. 3.

cheapest options. *See, e.g.*, 88 Fed. Reg. at 18,843, n.60 (stating that the cost of evaporation treatment is "economically achievable").

Finally, EPA found that the 2024 Rule as a whole—including the zero-discharge scrubber wastewater, bottom ash transport water, and leachate requirements—is economically achievable. EPA usually determines economic achievability based on costs to the industry and subcategory financial conditions. 89 Fed. Reg. at 40,202. A cost-to-revenue ratio of less than one percent suggests that a plant or owner is "unlikely to face economic impacts." *Id.* at 40,264. In this case, EPA identified between 220 and 391 entities owning regulated energy-generating units, and found that less than one percent of those plant owners would incur costs exceeding one percent of revenue. *Id.*; Ex. 4 at 4-5 to 4-9. Thus, the record shows that the costs of eliminating scrubber wastewater using zero-discharge technologies can be "reasonably borne by the industry." *Waterkeeper All., Inc.*, 399 F.3d at 516; *Rybachek*, 904 F.2d at 1290–91.

### 2. EPA did not "sidestep" any demonstrated errors in its cost-estimation methodology.

Movants claim that EPA's BAT determination for scrubber wastewater and leachate was flawed because the Agency arbitrarily "sidestepped" alleged errors in its cost-estimation methodology. Motion at 21–23. Movants acknowledge, however, that in response to EPA's request for performance and cost data, utilities provided "data in the wrong format or with insufficient specificity." *Id.* at 22.

9

Despite these utility-caused data errors, EPA responded to utilities that provided cost estimates for specific plants, including by revising its cost methodology for membrane filtration, which resulted in higher plant-level estimates. *See* Ex. 5 at 1188, 1192–97.

Movants also claim EPA acted arbitrarily by acknowledging underestimated compliance costs for some plants without questioning its BAT determinations as a result. Motion at 22. But the CWA requires EPA to determine BAT for industrial categories, not plant by plant,[17] based on costs to the industry as a whole.[18] EPA acknowledged it may have underestimated compliance costs for some plants, but noted also that it "likely . . . overestimated costs for other plants," Ex. 5 at 1188, and its "cost estimates do not account for leasing treatment technology equipment and may therefore be overestimated for some plants," *id.* at 1169. Further, there are several ways industry presented its cost estimates, both in comments and the Motion here, that exaggerate the extent to which they appear larger than EPA's cost estimates. *See generally* Ex. 6 (discussing how Movants' costs estimates are based on overdesigned and unnecessarily complex systems, use different scrubber flow optimization approaches, fail to provide underlying calculations or inputs, and

---

[17] *E.I. du Pont de Nemours & Co.*, 430 U.S. at 127.
[18] *Am. Iron & Steel Inst.*, 526 F.2d at 1051.

Appellate Case: 24-2123     Page: 15     Date Filed: 08/20/2024 Entry ID: 5426423

compare estimates from different years using different dollar values).[19] Thus, EPA did not "sidestep" any errors in its cost methodology; rather, the Agency adequately determined that "[o]verall, the EPA's cost estimates provide a reasonable estimate for purposes of determining economic achievability, as required by the CWA." Ex. 5 at 1188; *see also* Ex. 6 at 9 (concluding that "EPA's cost estimating methodology was based on reasonable and prudent engineering practices and cost estimating practices").

### 3. EPA adequately considered reliance costs and provided a reasoned explanation for its BAT determination in the 2024 Rule.

Movants' argument that EPA failed to account for the "substantial costs incurred in reliance on the 2020 Rule," Motion at 23, similarly fails. When an agency takes action that changes prior policy, the agency must provide a "reasoned explanation" for its change in position if "its prior policy has engendered serious reliance interests that must be taken into account." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

---

[19] Although the Court must base its review on the record and not consider extra-record evidence to determine whether Movants are likely to succeed on the merits, *Voyageurs Nat. Park Ass'n v. Norton*, 381 F.3d 759, 766 (8th Cir. 2004), Exhibit 6 (Declaration of Kevin Draganchuk, P.E., BCEE, and attached technical memorandum) summarizes and explains information included in EPA's rulemaking record. To the extent the Court considers Movants' extra-record evidence, it should also consider Exhibit 6. The exhibit is also offered to rebut Movants' arguments that their extra-record evidence demonstrates irreparable harm.

Here, EPA did more than merely demonstrate "awareness" that industry had incurred costs to comply with the 2020 Rule. Motion at 24. In response to industry comments, EPA provided a reasoned explanation for selecting zero-discharge technology as BAT in the 2024 Rule. EPA evaluated both the costs of the 2020 Rule and 2024 Rule in its cost analysis and determined that "even the cumulative cost of the two technologies [required to comply with both rules] is economically achievable." 89 Fed. Reg. at 40,219. As EPA explained, when more stringent technologies are available and economically achievable, "the fact that facilities may have to spend more to supplement or replace existing treatment systems, even relatively new ones, is not a sufficient reason on its own to reject selection of the technology." *Id.* Further, although facilities must meet BAT limitations "as soon as possible," 40 C.F.R. § 423.13(g)(4)(i)(A), EPA accounted for reasonable reliance interests by including a "'no later than' date approximately five-and-a half years following promulgation" of the rule, 89 Fed. Reg. at 40,219. Thus, contrary to Movants' claims, EPA understood and accounted for industry's costs to comply with the 2020 Rule when establishing the 2024 Rule's requirements, while providing a reasoned explanation for its change in position. *See Ohio v. EPA*, 144 S. Ct. 2040, 2054–55 (2024); *Fox Television*, 556 U.S. at 515.

12

## II.    MOVANTS FAIL TO SHOW IRREPARABLE HARM.

Movants' speculative claims do not justify the extraordinary remedy of a stay because they fail to demonstrate they "will *in fact*" suffer irreparable harm that is "both certain and great," and "will directly result" from the 2024 Rule during the pendency of this litigation.  *Packard Elevator v. I.C.C.*, 782 F.2d 112, 115 (8th Cir. 1986) (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)); *see also Nken*, 556 U.S. at 432–34 ("The party requesting a stay bears the burden of showing that the circumstances justify" the "extraordinary remedy" of a stay.). "[T]heoretical" harm is insufficient; the harm must be "actual" and of "such *imminence* that there is a 'clear and present' need" to stay the 2024 Rule pending judicial review. *Packard Elevator*, 782 F.2d at 115; *see also Morehouse Enters., LLC v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 78 F.4th 1011, 1018 (8th Cir. 2023) (denying injunction where alleged compliance costs were uncertain and feared to occur at some indefinite time).

### A. Movants Do Not Prove They Will in Fact Incur Great Costs Imminently.

Movants claim the 2024 Rule requires utility petitioners to "spend massive sums of money starting right now." Motion at 25. These arguments ignore the 2024 Rule's lengthy compliance timeline while citing inflated and misleading cost estimates and unsupported reliability claims.

13

The rulemaking record shows utilities can achieve compliance with the 2024 Rule's limits in roughly two years or less, undercutting Movants' claims that they would need to incur significant costs immediately to meet the December 31, 2029 compliance deadline. *See, e.g.*, Ex. 7 at PDF pp. 4, 6, 21, 26, 32. Further, the 2024 Rule's new limits do not apply to utilities until incorporated into facility-specific CWA permits, which are typically renewed no more frequently than every five years. Ex. 5 at 1135. At most, utilities will incur minimal compliance costs in the near term. *See West Virginia v. EPA*, No. 24-1120, 2024 WL 3542546, at *1 (D.C. Cir. July 19, 2024) (denying a motion to stay EPA's greenhouse gas regulations because the "actual compliance deadlines do not commence until 2030 or 2032—years after this case will be resolved.").

Moreover, though this case's schedule is not yet set, the parties have proposed briefing deadlines through March 2025. This case could thus be argued and decided by this Court long before December 2029, and even potentially in advance of the December 2025 deadline for plants to notify EPA if they intend to cease burning coal by 2034 instead of complying with the 2024 Rule's limits. 89 Fed. Reg. at 40,297, 40,304.

Movants' assertions that utilities will incur unrecoverable near-term compliance costs are unsupported. Movants rely on conclusory statements from declarations that lack underlying documentation, meriting little if any weight.

14

*Packard Elevator*, 782 F.2d at 115 ("Bare allegations of what is likely to occur are of no value since the court must decide whether the harm will *in fact* occur."). When Movants do provide underlying documentation, they cite unreasonable and unrepresentative examples. For example, Movants point to an estimate for Plant Miller, Motion at 17, that is based on an "overdesigned" and "unnecessarily complex" treatment system and thus is highly inflated. Ex. 6, Attach. A at 1–3; *see also id.* at 4–8 (explaining that EPRI's industry-wide 2024 Rule cost estimates are inflated). Movants also ignore that utilities could reduce compliance costs by leasing, rather than buying, zero-discharge technologies and/or repurposing existing equipment, including technologies installed to comply with the 2020 Rule. *See, e.g.*, Ex. 5 at 1166, 1169.

Although Movants highlight 2020 Rule compliance cost estimates that were larger than EPA's, this is not direct evidence that the 2024 Rule will harm them. *See Packard Elevator*, 782 F.2d at 115. In any event, Movants fail to explain or document how those estimates were developed, leaving no way to evaluate their credibility or ascertain why they were larger than EPA's estimates. *See, e.g.*, Motion, Ex. 5 at 13, 17 (showing only a summary line item for "[scrubber] WWT Capital" for Plant Mitchell); Ex. 6, Attach. A at 3–4. They were also just estimates; utilities' *actual* compliance costs for the 2020 Rule may be far less. For example, two Kentucky utilities recently projected actual compliance costs $132.6 million

*lower* than their 2020 estimates for three plants (Ghent, Mill Creek, and Trimble County), Ex. 8 at 1, that Movants rely on to show cost estimates exceeding EPA's, Motion at 15. Similarly, one of Movants' declarants asserts that 2020 Rule compliance costs at three plants totaled $94 million, Motion Ex. 1 ¶ 24, but the utility had previously estimated that the compliance costs *at one plant alone* would be $148.5 million, *see* Ex. 9 at PDF p. 47, and at another plant $48.4 million, *see id.* at PDF p. 48, underscoring how pre-compliance estimates are often far larger than actual compliance costs. Movants also compare EPA's estimates in 2018 dollars to industry estimates that use dollar values from more recent years; by not holding the dollar value constant, this "flawed approach" inflates the appearance of a difference between EPA and industry estimates. Ex. 6, Attach. A at 9.

### B. Movants Speculate About Reliability Harms.

The Rule will not trigger any reliability problems, let alone imminently. Ex. 10 ¶¶ 19–21;[20] *contra* Motion at 27. EPA established a December 2029 timeframe for compliance with new limits, and plants that opt to retire or convert to gas can continue operating until 2034 before transitioning. Moreover, retiring plants can operate beyond 2034 if needed for reliability. 89 Fed. Reg. at 40,284, 40,302–03. Because the 2024 Rule includes these flexibilities, there is no basis for assuming

---

[20] Exhibit 10 (Declaration of Metin Celebi, Ph.D.) is offered to rebut Movants' arguments that their extra-record evidence demonstrates irreparable harm.

the 2024 Rule will "directly result" in plant retirements or reliability problems during this litigation. Movants' repeated invocation of EPA's separate regulation of power plants' greenhouse gas emissions (Motion, Ex. 1 ¶¶ 36, 40–41, Ex. 19 ¶ 44, Ex. 20 ¶ 35)—which is not at issue in this case—underscores their failure to show that any harm to grid reliability would "directly result" from the 2024 Rule itself.

Movants nevertheless claim that a stay is required to maintain reliability. They are mistaken. First, EPA estimates that only thirty-five power plants will incur costs under the 2024 Rule—five percent of the total 688 steam electric power plants in the country—and those costs will be relatively modest. 89 Fed. Reg. at 40,265–66; Ex. 10 ¶¶ 5, 14. EPA modeled the 2024 Rule's impacts and found that, by 2035, only five power plants (0.7% of U.S. generation capacity) might retire earlier than planned. 89 Fed. Reg. at 40,265. Movants provide no evidence that this would certainly and imminently impact reliability during this litigation.

Second, energy market economics, not the 2024 Rule, have been, and will continue to be, the primary driver for coal-plant retirement decisions. Ex. 10 ¶¶ 6–16. Over the past two decades, coal plant retirements have resulted from declining gas prices, the increasing unreliability and cost to operate aging coal plants, and rapid growth in renewables. *Id.*; Ex. 4 at 2-15. These economic and cost factors affect all coal plants, whereas the 2024 Rule affects only a fraction of plants.

Appellate Case: 24-2123    Page: 22    Date Filed: 08/20/2024 Entry ID: 5426423

Third, the Motion fails to acknowledge that utilities, regulators, and transmission organizations charged with maintaining the grid are already taking steps to ensure grid reliability, including planning for resource adequacy, and have several tools to address reliability impacts if and when they arise. 89 Fed. Reg. at 40,208; Ex. 10 ¶ 20.

Finally, Movants assert only that retirements "*could* undermine reliability." Motion at 27, Ex. 19 at 41, n.7 ("*could* place the reliability of the electric grid in jeopardy") (emphasis added), Ex. 20 ¶ 30 ("potential reliability risks"), Ex. 23 ¶¶ 7–9 ("I have concerns that the Final Rule will undermine [] reliability . . . beginning in 2028 if currently expected generator requirements actually occur."). These speculative harms are insufficient to justify the "extraordinary" remedy of a stay. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008); *Packard Elevator*, 782 F.2d at 115.

### C. Any Near-Term Planning Costs Would Be Minimal.

Movants similarly fail to prove the 2024 Rule will directly result in significant near-term costs to evaluate retrofits or replacement generation. Motion at 25–26. Their vague concerns about resource planning costs are speculative and unquantified, and prudent utility practice inherently entails continuous evaluation of regulatory risks and the costs and benefits of replacement generation. Ex. 11

18

¶¶ 4, 10.[21] Regulators and grid operators are likewise responsible for continually evaluating resource adequacy, regardless of the 2024 Rule and whether it is stayed. Ex. 10 ¶ 20. Moreover, Movants fail to demonstrate that any engineering costs would be "great" relative to utilities' parent companies' multi-billion-dollar operating revenues. Ex. 11 ¶¶ 33–34; *Packard Elevator*, 782 F.2d at 115. And, for regulated utilities, like some Movants, those planning and engineering costs would be recoverable from customers if prudently incurred. *Id.* ¶¶ 19, 34.

Finally, Movants claim any retirement decision is "effectively irreversible," Motion at 26, but they fail to identify any "certain" or "imminent" retirement decision that must be made before this Court reaches the merits.

In sum, Movants' efforts to show "great," "certain," and "imminent" harm fail.

## III. THE PUBLIC INTEREST AND BALANCE OF EQUITIES WEIGH HEAVILY AGAINST A STAY.

The public interest and the balance of equities among interested parties also weigh heavily against a stay. *See Nken*, 556 U.S. at 434.

Coal plants dump large quantities of harmful pollutants into U.S. waterways. *See, e.g.*, Ex. 12 at Tbl.26 (estimating that under a baseline scenario assuming full compliance with the 2020 Rule, power plants will discharge 807 million pounds of

---

[21] Exhibit 11 (Declaration of Devi Glick) is offered to rebut Movants' arguments that their extra-record evidence demonstrates irreparable harm.

pollutants per year). Many of these pollutants cause neurological impairment, cancer, and other human health effects, and harm to aquatic life and fish-eating wildlife. Ex. 13 at 3-1 to 3-12. EPA estimates that power plants' discharges negatively affect public water systems supplying drinking water for over 30 million people and the habitats for "over 100 high-vulnerability threatened and endangered species." 89 Fed. Reg. at 40,276. Among other things, EPA projects that under a baseline scenario assuming full 2020 Rule compliance, power plant discharges will continue to make water unsafe for human use in 38 waterbodies and render 777 downstream river miles unsafe for human health or wildlife. Ex. 14 at 32, Tbl.9, 50, Tbl.21.

People who live, work, and recreate downstream from coal plant discharges are concretely harmed by the diminished water quality those facilities cause. *See, e.g.*, Ex. 15. Some impacted waterbodies supply drinking water to communities. *See, e.g.*, Ex. 15 at Hill Decl. ¶¶ 9–11; McKiernan Decl. ¶¶ 5–6. Many community members have reduced or entirely stopped using and enjoying those waterways, due to concerns over the health effects of ingesting or contacting toxic pollutants, or consuming fish caught in those waters. *See, e.g.*, Ex. 15 at McKiernan Decl. ¶ 9; Limbach Decl. ¶¶ 8–9, 11; Sprouse Decl. ¶¶ 6–9, 12–13; Kotcon Decl. ¶¶ 7, 9, 12; Davis Decl. ¶ 6.

If the 2024 Rule were stayed, and any compliance deadlines were subsequently delayed, impacted community members would continue to be harmed and deprived of the health and environmental benefits of improved water quality. According to EPA, the 2024 Rule would prevent the dumping of over 660 million pounds of pollutants into U.S. waterways each year. 89 Fed. Reg. at 40,198, 40,267. EPA's Benefit-Cost Analysis demonstrates that the 2024 Rule's benefits are three to six times greater than its costs—even as EPA acknowledges that a significant portion of the rule's benefits are not quantified or monetized (and therefore undercounted). Ex. 16 at ES-4, Tbl.ES-3. The 2024 Rule's benefits include, among others, avoiding ninety-eight bladder cancer cases and twenty-eight cancer deaths attributable to bromide pollution of drinking water sources from power plant discharges, *id.* at 4-20, Tbl.4-8, and reducing the number of waterbodies that are unsafe for fish-eating wildlife by eighty-five percent, and that present a risk of cancer to humans from eating arsenic-containing fish by seventy-eight percent, Ex. 14 at 5.

Even short delays in water quality improvements caused by a stay of the 2024 Rule and any subsequent delay of compliance deadlines would result in significant harm. For example, short-term human exposure to mercury *in utero* can cause permanent neurological damage and IQ loss. Ex. 16 at 4-26. Similarly, ecological damage from toxic pollutants can occur in short periods of time, "and

21

even short periods of exposure (e.g., less than a year) can cause observable ecological impacts that last for years." Ex. 14 at 2. These significant harms strongly weigh against staying the 2024 Rule.

## <u>CONCLUSION</u>

For the reasons set forth above, the Court must deny Utility and State Petitioners' stay motion.

Respectfully submitted this 20th day of August, 2024.

/s Thomas Cmar
THOMAS CMAR
Earthjustice
6608 Wooster Pike
Cincinnati, OH 45227
(312) 257-9338
tcmar@earthjustice.org

MYCHAL OZAETA
Earthjustice
707 Wilshire Blvd., Suite 4300
Los Angeles, CA 90017
(213) 766-1069
mozaeta@earthjustice.org

LAUREN PIETTE
Earthjustice
311 S. Wacker Dr., Suite 1400
Chicago, IL 60606
(312) 500-2193
lpiette@earthjustice.org

*Attorneys for Respondent-Intervenors Clean Water Action, Sierra Club, Waterkeeper Alliance, Inc., and Natural Resources*

22

*Defense Council, Inc.*

JOSHUA SMITH
Sierra Club
2101 Webster Street, Suite 1300
Oakland, CA 94612
(415) 977-5560
joshua.smith@sierraclub.org

*Attorney for Respondent-Intervenor*
*Sierra Club*

ABEL RUSS
Environmental Integrity Project
888 17th St. NW, Suite 810
Washington, DC 20006
(202) 296-8800
aruss@environmentalintegrity.org

*Attorney for Respondent-Intervenors*
*Environmental Integrity Project,*
*PennEnvironment, Inc., and Prairie Rivers*
*Network*

NICHOLAS S. TORREY
Southern Environmental Law Center
601 W. Rosemary Street, Suite 220
Chapel Hill, NC 27516
(919) 967-1450
ntorrey@selcnc.org

FRANK S. HOLLEMAN III
Southern Environmental Law Center
525 East Bay Street, Suite 200
Charleston, SC 29403
(843) 720-5270
fholleman@selcsc.org

23

*Attorneys for Petitioners (Case No. 24-2255) Catawba Riverkeeper and Winyah Rivers Alliance*

24

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rules of Appellate Procedure 27 and 32(g)(1), the undersigned counsel for Respondent-Intervenors certifies that this response complies with (1) with the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5199 words and (2) with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5)–(6) because it has been prepared using Microsoft Office Word for Office 365 and is set in Times New Roman font in size equivalent to 14 points or larger.

*/s Thomas Cmar*
THOMAS CMAR

*Attorney for Respondent-Intervenors Clean Water Action, Sierra Club, Waterkeeper Alliance, Inc., and Natural Resources Defense Council, Inc.*

25

## CERTIFICATE OF SERVICE

I certify that on August 20, 2024, this response to Utility and State

Petitioners' stay motion and accompanying attachments were served on all parties

via this Court's CM/ECF system.


_/s Thomas Cmar_____
THOMAS CMAR

*Attorney for Respondent-Intervenors Clean Water Action, Sierra Club, Waterkeeper Alliance, Inc., and Natural Resources Defense Council, Inc.*

26